UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | No. 6:13-CR-49-GFVT-HAI-2 |
| v. | ) ) | RECOMMENDED DISPOSITION |
| CHRISTOPHER BENTLEY, | ) ) | |
| Defendant. | ) ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

On referral from District Judge Van Tatenhove (D.E. 458), the Court considers reported violations of supervised release conditions by Defendant Christopher Bentley. Defendant's supervised release was revoked last year. D.E. 407. And another set of revocation proceedings commenced in March 2019, but the charged violation was dismissed. D.E. 433.

Judge Van Tatenhove entered a judgment against Defendant in December 2014 following a guilty plea to participating in a conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846. D.E. 321. Defendant received a prison sentence of 46 months, followed by a three-year term of supervised release. *Id*. Defendant began his first term of supervised release on December 6, 2017.

On September 7, 2018, the United States Probation Office ("USPO") issued a report charging three violations of Defendant's release conditions. Defendant submitted a urine sample that indicated methamphetamine and hydrocodone upon instant testing. Defendant signed an admission stating that he "wanted to have some fun and used methamphetamine and hydrocodone with 'a couple of girls' approximately three days ago." He was charged with using a controlled substance without a prescription and two counts of committing a crime (possession

of methamphetamine and possession of hydrocodone). D.E. 402 at 1-2. Defendant stipulated to all three violations. *Id*. at 3. His release was revoked, and he was sentenced to five months of imprisonment followed by a two-year term of supervised release. D.E. 404 at 4.

On March 25, 2019, the USPO issued a report charging a violation of the condition that prohibits Defendant from committing another federal, state, or local crime. According to that report, Defendant was arrested in West Virginia on the day he was released from federal prison. He was charged with three misdemeanors: disorderly conduct, public intoxication, and obstructing a police officer. At his initial appearance, Defendant requested a preliminary hearing on the charges. The probation officer testified. D.E. 432. The Court dismissed the violation without prejudice "[b]ecause [government] counsel was not prepared to address the statutory elements of the state crimes at issue." D.E. 433. Accordingly, on April 12, 2019, Defendant was released again under supervision. *Id*.

## I.

On September 25, 2019, the USPO issued the Supervised Release Violation Report ("the Report") that initiated these proceedings. The Report charges two violations. The first violation concerns the condition that prohibits committing another federal, state, or local crime. According to the Report:

> On September 15, 2019, the defendant was arrested by the Clay County, Kentucky, Sheriff's Office and charged with the following: Public Intoxication of a Controlled Substance-K.R.S. § 525.100, a Class B misdemeanor; Terroristic Threatening-3rd Degree-K.R.S. § 508.080, a Class A misdemeanor; Criminal Mishchief-3rd Degree-K.R.S. § 512.040, a Class B misdemeanor and Resisting Arrest-K.R.S. § 520.090, a Class A misdemeanor. The case is filed under Clay County, Kentucky, District Court case #19-M-860. The defendant posted bond and was released on September 16, 2019.

This is a Grade C violation.

2

Violation #2 charges a violation of the condition that requires Defendant to notify the probation officer within 72 hours of any arrest or questioning by a law enforcement officer. Violation #2 alleges that Defendant failed to report his September 15 arrest. In fact, at the evidentiary hearing, the probation officer testified he conducted a home visit with Defendant on September 23, but Defendant did not mention the arrest. This is also a Grade C violation.

According to the public state docket, the charges stemming from Defendant's September 15 arrest were dismissed without prejudice on December 9 on the Commonwealth's motion because Defendant was in federal custody.

The Court conducted an initial appearance pursuant to Rule 32.1 on October 21, 2019. D.E. 446. A preliminary hearing was conducted, and Defendant conceded probable cause. *Id*. The United States moved for interim detention; Defendant argued for release. *Id*. Based on the heavy defense burden under 18 U.S.C. § 3143(a), the undersigned remanded Defendant to the custody of the United States Marshal. *Id*.

At the final hearing on December 17, 2019, Defendant was afforded all rights due under Rule 32.1 and 18 U.S.C. § 3583. D.E. 456. Defendant contested both violations, and an evidentiary hearing was conducted. *Id*. The arresting officer, Clay County Sheriff's Deputy Brandon Edwards, testified, as did Defendant's federal probation officer, Nick Jones. D.E. 455.

After the presentation of evidence, Defendant conceded that Violation #2 had been established by a preponderance of the evidence. No evidence indicated that Defendant had reported his arrest to the probation officer. And Officer Jones testified he received no such report, despite the facts that Defendant was released from jail the day after his arrest and Officer Jones visited him the following week.

As to Violation #1, the defense conceded that the evidence supported the charges of terroristic threatening and resisting arrest. The defense argued that criminal mischief and public intoxication had not been proven. The Court announced it would recommend that Defendant be found guilty of both violations. D.E. 456. Of course, a finding of guilt on any of the four charged state crimes could support Violation #1. The Court announced it would recommend that Defendant be found guilty, by a preponderance of the evidence, of terroristic threatening, criminal mischief, and resisting arrest. The Court took under advisement whether Defendant was guilty of public intoxication. The Court now recommends that Defendant be found guilty, by a preponderance of the evidence, of all four charges described in Violation #1.

## II.

The Court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. 18 U.S.C. § 3583(e)(3). As noted, Violation #2 is not disputed. No evidence was offered to contradict Officer Jones's testimony that Defendant failed to report his arrest within 72 hours, as required by Defendant's conditions of release.

Violation #1 alleges four violations of state law, based on the charges resulting from Defendant's September 15 arrest. The arresting officer, Deputy Edwards testified concerning the circumstances of the arrest. His testimony elaborated on the allegations in the Citation attached to the Report. Deputy Edwards testified that he was with Sgt. Gabbard on September 15, 2019, when they received a complaint about a disturbance at the home of a family named Lawson. When he arrived, Deputy Edwards saw Defendant in the driveway of the house. Three men were outside, along with April Collett. Deputy Edwards heard Defendant screaming, "I'm gonna kill all you motherfuckers!" The men at the house were trying to restrain him. The officers gave

4

Defendant loud verbal commands that he show his hands and that he put his hands behind his back. Edwards testified he told Defendant he was under arrest, believing he was committing terroristic threatening. The officers tried to put handcuffs on him. But he resisted. During the struggle, the three of them slid downhill. The officers' shirts were grass stained from the altercation, and Deputy Edwards's name tag was broken off. The officers finally got Defendant's hands cuffed behind his back. Assisted by one of the civilian men, they pulled Defendant up the hill and placed him in the back of their cruiser, which was a Dodge Charger.

According to Deputy Edwards, Defendant was "extremely amped up." He was "sweating profusely." There was a mild "odor of alcohol." But Edwards believed Defendant exhibited signs of having ingested some other substance, which Edwards surmised was methamphetamine.

Defendant continued his angry rampage inside the back seat of the cruiser. He spat, screamed, and banged his head against the cage. Defendant was "out of control." He kept saying he was going to "kill all those motherfuckers" and that the woman present at the house was a "whore and a slut."

Deputy Edwards took Defendant to the county jail and notified them beforehand so they could be prepared to strap him into a chair when he arrived. Deputy Edwards testified that, oddly, after Defendant was strapped into the chair at the jail, he became calmer and more sensible. But Defendant did not know what had happened and did not understand what he had done.

Deputy Edwards testified that he and Sgt. Gabbard both thought at the time that Defendant was on methamphetamine. Defendant reportedly told Edwards that he had drunk a lot of moonshine. However, Defendant's speech was not slurred. Defendant was "extremely strong," he was "extremely amped up," and he was sweating profusely. Edwards smelled only

"a hint" of alcohol on him. Edwards believed Defendant had taken both alcohol and methamphetamine. No testing was performed to detect the presence of alcohol or drugs. Edwards testified that he commonly encounters people who have taken meth or suboxone, and he frequently sees people who have taken both meth and alcohol. This experience contributed to his conclusion that Defendant was intoxicated on a controlled substance.

As indicated, Officer Jones testified that Defendant did not report his September 15 arrest, even though they were together on September 23 for a home visit. Officer Jones testified that Defendant had been compliant from April to September of 2019. Defendant was working at Hearthside Foods, and he had only missed a couple of treatment appointments due to work responsibilities. Defendant was taking drug screens. Officer Jones had seen no signs of alcohol use by Defendant. And a drug screen given at the September 23 home visit was negative. The screen would not have detected alcohol. Officer Jones opined that additional supervision would be beneficial for Defendant, particularly because being employed and going through drug treatment had helped him.

**A.**

The government met its burden of proving all four charges by a preponderance of the evidence. The first charge listed in the citation is public intoxication on a controlled substance:

> A person is guilty of public intoxication when he appears in a public place manifestly under the influence of a controlled substance, or other intoxicating substance, excluding alcohol (unless the alcohol is present in combination with any of the above), not therapeutically administered, to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity.

Ky. Rev. Stat. Ann. § 525.100(1).

First, the driveway of the Lawsons' home qualifies as a "public place." Section 525.010 defines "public place" to mean:

> a place to which the public or a substantial group of persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds, and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place.

Ky. Rev. Stat. Ann. § 525.010(3). Other courts in Kentucky have found that driveways, front yards, and even unenclosed front porches qualify as a "public place" under this statute. *See United States v. Woodall*, No. 5:10-CR-121-KSF-REW, 2013 WL 1412342, at *7 (E.D. Ky. Mar. 25, 2013); *Maloney v. Commonwealth*, 489 S.W.3d 235, 241 (Ky. 2016); *Neal v. Commonwealth*, No. 2009-CA-316-MR, 2010 WL 890033, at *2-3 (Ky. Ct. App. Mar. 12, 2010); *Quintana v. Commonwealth,* 276 S.W.3d 753, 758-760. (Ky. 2008) ("[C]ertain areas such as driveways, walkways, or the front door and windows of a home . . . are properly approachable by any member of the public, unless obvious steps are taken to bar the public[.]"). At Defendant's final hearing, the parties agreed that the driveway and yard where the arrest occurred qualified as a "public place."

Second, Deputy Edwards testified he believed Defendant was manifestly under the influence of a controlled substance, namely methamphetamine, perhaps in combination with alcohol. He relied on his experience as a peace officer and explained that, whereas alcohol makes one sluggish and causes slurred speech, Defendant was "amped up," sweaty, and very strong. Deputy Edwards believed these signs indicated meth intoxication, rather than alcohol intoxication. Accordingly, he did not believe Defendant's statement that he had drunk a lot of moonshine—Defendant only smelled slightly of alcohol and he did not act alcohol-intoxicated.

Instead, Defendant's bizarrely aggressive behavior indicated drug intoxication. No evidence suggested Defendant was on any prescription medication.

Deputy Edwards's testimony was uncontested and the Court credits his assessment of Defendant's intoxication. The arresting officer's testimony suffices to establish it is more likely than not that Defendant was manifestly under the influence of methamphetamine, a controlled substance, perhaps in combination with alcohol. Further, the testimony establishes Defendant was clearly endangering himself and other persons or property, and that he was unreasonably annoying persons in his vicinity. The government established each element of KRS § 525.100 by a preponderance of the evidence.

### B.

The second listed charge is third-degree terroristic threatening. This crime is committed when a person "threatens to commit any crime likely to result in death or serious physical injury to another person or likely to result in substantial property damage to another person[.]" Ky. Rev. Stat. Ann. § 508.080(1)(a). Deputy Edwards testified this charge was based on Defendant's repeated, loud, angry threat that he was "gonna kill all you motherfuckers." The defense conceded at the final hearing that it would be "difficult to argue" that Defendant did not commit third-degree terroristic threatening. The Court agrees. The government has proven this charge by a preponderance of the evidence.

### C.

The third charge is third-degree criminal mischief. A person commits this misdemeanor when, "[h]aving no right to do so or any reasonable ground to believe that he has such right, he intentionally or wantonly defaces, destroys or damages any property[.]" Ky. Rev. Stat. Ann. § 512.040(1)(a). Deputy Edwards testified that his uniform shirt was defaced and damaged with

grass stains during the tussle with Defendant. And, when tumbling down the hill during the kerfuffle, the pins broke off the name plate on his shirt. The defense argued it was not necessarily Defendant's fault that he and the officers tumbled downhill; the damage might not have resulted from Defendant's wanton conduct. The Court finds, however, that the charge is proven by a preponderance of the evidence. Deputy Edwards testified Defendant, who was angry and "amped up," was actively resisting arrest. The tumble downhill resulted because Defendant would not allow the officers to cuff him. Defendant's wanton conduct caused the damage and defacement.

### D.

The fourth and final charge is resisting arrest:

(1) A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:

    (a) Using or threatening to use physical force or violence against the peace officer or another; or

    (b) Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

Ky. Rev. Stat. Ann. § 520.090(1). The defense offered no argument that Defendant was not guilty of resisting arrest. Indeed, Deputy Edwards's uncontradicted testimony was that Defendant refused to be handcuffed. He struggled against the officers' attempts to arrest him, and he and the officers tumbled down a hill before he was finally subdued. Defendant therefore intentionally attempted to prevent his arrest by using physical force against a peace officer. Alternatively, he created a substantial risk of causing physical injury to a peace officer when his actions led to them all rolling downhill. All four charges underlying Violation #1 are proven by a preponderance of the evidence.

### III.

The Court has evaluated the entire record, including the Report and accompanying documents, and the sentencing materials from the underlying Judgment. Additionally, the Court has considered all the § 3553 factors imported into the § 3583(e) analysis.

Under § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant pleaded guilty to participating in a conspiracy to manufacture methamphetamine, a Class C felony. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 846. For a Class C felony, the maximum revocation sentence provided under § 3583 is two years of imprisonment. 18 U.S.C. § 3583(e)(3).

The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007). Under § 7B1.1, both violations are Grade C. Given Defendant's criminal history category of I (the category at the time of the conviction) and Grade C violations, Defendant's range, under the Revocation Table of Chapter 7, is three to nine months.

A court may also re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration imposed due to the violation. *See* 18 U.S.C. § 3583(b), (h). The post-revocation cap depends on the "term of supervised release authorized by statute for the offense that resulted in the original term of supervised release." *See* 18 U.S.C. § 3583(h). Given the nature of Defendant's conviction, pursuant to 18 U.S.C. § 841(b)(1)(A), there is no maximum term of supervised release that can be re-imposed.

## IV.

After the Court announced it would recommend finding Defendant guilty of both violations, the parties argued for different penalties. The government recommended an upward variance—twelve months of incarceration, followed by twelve months of supervised release. The defense requested seven or eight months of incarceration, with no supervised release to follow. Neither side requested new conditions.

The government stressed that the breach of trust was egregious, particularly after what happened in March. In March 2019, Defendant was arrested the day he was released from prison. But those charges, very similar to the ones now before the Court, were dismissed. Defendant failed to learn from that experience and ended up getting arrested again for misconduct involving police officers while being intoxicated in public. The March violation was essentially a "trial run" for the current violations. In other words, Defendant knew that such behavior would violate his supervised release. The same factor reveals a need to protect the public and deter new criminal conduct. Essentially, the government argued, Defendant showed a lack of respect for the law. The government acknowledged that the violations are Grade C, but emphasized that there are essentially five violations.

The government argued that there was no mitigation in this case for accepting responsibility. Defendant fought the charges, even though his case was very weak.

The defense stressed that the violations were Grade C and encouraged the Court to follow the Guidelines. The violations from last year that resulted in revocation, in contrast, included a Grade B violation and garnered a five-month sentence. Thus, a within-Guidelines sentence of seven or eight months would be an appropriate escalation. Even though revocation is not mandatory, the defense conceded revocation was appropriate. The defense argued that the

March violation conduct was different in that Defendant had allegedly locked himself in a bathroom stall at a fast food restaurant and declined to follow an officer's order to open the door. Thus, this was not a replay of the same behavior. The defense argued that supervision was not needed because it was not helping Defendant.

Defendant addressed the Court. He only stated that the Court could see how much he has improved his life since he first appeared in federal Court.

## V.

To determine an appropriate revocation term of imprisonment, the Court has considered all the statutory factors imported into the § 3583(e) analysis, as well as the Guidelines Range of three to nine months. In this case, there is not much information in the PSR that is either aggravating or mitigating.

The nature and circumstances of Defendant's underlying conviction are serious, of course. *See United States v. Johnson*, 640 F.3d 195, 203 (6th Cir. 2011) (explaining that this sentencing factor focuses upon the original offense rather than the violations of supervised release). He obtained pseudoephedrine so co-conspirators could use it in meth production. And he was addicted to hydrocodone at the time. Although he was not charged with meth use or possession, the Court has found that he was intoxicated on a controlled substance on the day of his arrest. Looming large is the fact that drug use gets Defendant in trouble with the law.

Defendant's personal history and characteristics are colored by the fact that this is his second revocation, and the third time Probation has sought revocation. Defendant performed well on supervision for a year prior to his first revocation. But, after his second release from federal prison, he immediately got in trouble. Appearing before this Court and having the charged dismissed did not adequately seize his attention. Defendant received a lenient sentence

in 2014. Although his Guidelines Range was 57-71 months, Defendant was sentenced to 46 months of incarceration. Prior leniency provides a ground for imposing a harsher sentence upon revocation. Application note 4 to U.S.S.G. § 7B1.4 counsels that when there was a downward departure at sentencing, "an upward departure may be warranted" on revocation. Here, there was a significant downward departure of eleven months.

The government is correct that, in light of Defendant's past, his breach of the Court's trust looms large. The Guidelines suggest that the primary wrong in the supervised release context is the violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b). The Court must impose a sentence that is sufficient, but not greater than necessary, to address Defendant's breach of trust and the other statutory goals imported into § 3583(e). After previously having his pretrial bond and post-conviction supervised release revoked for drug use, Defendant again apparently used drugs and ended up involved in a dangerous incident. Important here is that people could have gotten hurt. Even if his threat to kill was not a serious threat, Defendant was belligerent and physically aggressive. It took multiple men to subdue him. Further exacerbating the breach of trust is Defendant's failure to report his arrest to his probation officer—even though the officer visited him after the incident. A significant penalty is needed to address this trust breach.

The need to avoid unwarranted sentencing disparities among defendants with similar records who have committed similar violations is addressed by the recommendation of a sentence within Defendant's Guidelines Range. The Court recommends a sentence at the top of the Range—nine months—to be followed by another year of supervised release.

A sentence of nine months is within the Guidelines Range and, for the reasons stated above, this penalty is sufficient but not greater than necessary to meet the section 3553(a) factors

incorporated into this analysis. *See* 18 U.S.C. § 3583(e). More supervision is appropriate here to protect the public and deter future criminal conduct. Defendant's history shows that when he works and stays off drugs, good things happen. The Court's hope is that Defendant will stay clean and busy in the future.

## VI.

Based on the foregoing, the Court **RECOMMENDS:**

(1) That Defendant be found guilty of both violations.

(2) Revocation with a term of imprisonment of nine months, followed by a 24-month term of supervised release, under the conditions previously imposed.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within **fourteen days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Judge Van Tatenhove's docket upon submission. If Defendant chooses to waive allocution, he **SHALL** do so on or before the deadline for filing objections.

This the 23rd day of December, 2019.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge