UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 6:13-CR-49-GFVT-HAI-2 |
| ) | |
| v. ) | RECOMMENDED DISPOSITION |
| ) | |
| CHRISTOPHER BENTLEY, ) | |
| ) | |
| Defendant. ) | |

*** *** *** ***

On referral from District Judge Van Tatenhove (D.E. 467), the Court considers reported violations of supervised release conditions by Defendant Christopher Bentley. This is his third revocation.

**I.**

Judge Van Tatenhove entered a judgment against Defendant in December 2014 following a guilty plea to participating in a conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846. D.E. 321. Defendant received a prison sentence of 46 months, followed by a three-year term of supervised release. *Id*. Defendant began his first term of supervised release on December 6, 2017.

On September 7, 2018, the United States Probation Office ("USPO") issued a report charging three violations of Defendant's release conditions. Defendant submitted a urine sample that indicated methamphetamine and hydrocodone upon instant testing. Defendant signed an admission stating that he "wanted to have some fun and used methamphetamine and hydrocodone with 'a couple of girls' approximately three days ago." He was charged with using a controlled substance without a prescription and two counts of committing a crime (possession

of methamphetamine and possession of hydrocodone). D.E. 402 at 1-2. Defendant stipulated to all three violations. *Id*. at 3. His release was revoked, and he was sentenced to five months of imprisonment followed by a two-year term of supervised release. D.E. 404 at 4.

On March 25, 2019, the USPO issued a report charging a violation of the condition that prohibits Defendant from committing another federal, state, or local crime. According to that report, Defendant was arrested in West Virginia on the day he was released from federal prison. He was charged with three misdemeanors: disorderly conduct, public intoxication, and obstructing a police officer. At his initial appearance, Defendant requested a preliminary hearing on the charges. The probation officer testified. D.E. 432. The Court dismissed the violation without prejudice "[b]ecause [government] counsel was not prepared to address the statutory elements of the state crimes at issue." D.E. 433. Accordingly, on April 12, 2019, Defendant was released again under supervision. *Id*.

On September 25, 2019, the USPO issued a report charging two violations. First, the report charged defendant with violating state law after he was arrested and charged in Clay County, Kentucky, District Court case #19-M-860 with:

> Public Intoxication of a Controlled Substance-K.R.S. § 525.100, a Class B misdemeanor; Terroristic Threatening-3rd Degree-K.R.S. § 508.080, a Class A misdemeanor; Criminal Mishchief-3rd Degree-K.R.S. § 512.040, a Class B misdemeanor and Resisting Arrest-K.R.S. § 520.090, a Class A misdemeanor.

These state charges were dismissed without prejudice on the Commonwealth's motion because Defendant was in federal custody. The second violation alleged Defendant failed to notify the USPO of the arrest. Defendant contested these violations.

The Court conducted a hearing at which the arresting officer and probation officer testified. After the presentation of evidence, Defendant conceded that he had failed to inform

2

probation of his arrest. He also conceded that the evidence supported the charges of terroristic threatening and resisting arrest. The undersigned recommended a finding that the government had proven the other two state charges by a preponderance of the evidence. D.E. 459. Defendant objected to the recommendation (D.E. 460), and Judge Van Tatenhove conducted a hearing (D.E. 464). Judge Van Tatenhove found that the violations had occurred, revoked Defendant's release, and sentenced him to nine months' incarceration followed by twelve months of supervised release. D.E. 465, 466. Defendant was released again on June 24, 2020.

## II.

On September 9, 2020, the USPO issued the Supervised Release Violation Report ("the Report") that initiated these proceedings. The Report charges a single violation of the condition that prohibits committing another federal, state, or local crime. According to the Report:

> On September 8, 2020, the defendant was arrested by the Clay County, Kentucky, Sheriff's Office and charged with the following: Operating a Motor Vehicle Under the Influence of Alcohol/Drugs-1st Offense-K.R.S. § 189A.010, a Class B misdemeanor; Failure to Wear Seat Belts-K.R.S. § 189.125, a violation; and Disorderly Conduct-2nd Degree-K.R.S. § 525.060, a Class B misdemeanor.

The charges are in Clay District Court case number 20-M-491. This is a Grade C violation.

On September 21, 2020, the USPO issued an Addendum to the Report that includes a second alleged violation. Violation #2 charges a violation of the condition that requires Defendant to abstain from the use of alcohol. Based on the circumstances of Defendant's September 8 DUI arrest (which involved the use of alcohol), this is another Grade C violation.

The Court conducted an initial appearance pursuant to Rule 32.1 on September 21, 2020, and set a final hearing following a knowing, voluntary, and intelligent waiver of the right to a preliminary hearing. D.E. 471. At the initial appearance, the United States made an oral motion for interim detention; Defendant did not argue for release. Based on the heavy defense burden

under 18 U.S.C. § 3143(a), the undersigned remanded Defendant to the custody of the United States Marshal. *Id.*

At the final hearing on October 15, 2020, Defendant was afforded all rights due under Rule 32.1 and 18 U.S.C. § 3583. D.E. 477. Defendant contested both violations, and an evidentiary hearing was conducted. *Id.* The government presented the testimony of the arresting officer, Sergeant Jeremy Wayne Gabbard of the Clay County Sheriff's Office. The defense called Defendant's grandfather A.B. Lawson, Defendant's mother Ruth Gibson, and Probation Officer Nick Jones. The Court now recommends that Defendant be found guilty, by a preponderance of the evidence, of DUI-First Offense, as described in Violation #1, and of alcohol consumption, as described in Violation #2.

### III.

The Court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. 18 U.S.C. § 3583(e)(3). The following is a summary of key testimony from the hearing.

The government called Sgt. Gabbard. He has been with the Clay County Sheriff's Office since 2012, but he worked other law enforcement jobs before that. He testified that he was trained in the police academy to administer field sobriety tests to detect intoxication. Sgt. Gabbard explained that, on September 8, he heard a complaint over the radio of an altercation. He was not able to go immediately, but when he arrived at the location of the complaint he learned from other officers that Ruth Gibson, Defendant's mother, had been arrested for public intoxication, and that a man (Defendant) had run across a field and disappeared into the woods. Accompanied by Sheriff Robinson and Deputy Smith, Sgt. Gabbard went looking for the man. While they were stopped near a trailhead, they saw Defendant driving toward them. Sheriff

Robinson told Sgt. Gabbard that the car was the car from the scene of the altercation. Sheriff Robinson flagged down the car, and it stopped. Sgt. Gabbard recognized Defendant because he had met him once before—he was one of the officers present at Defendant's arrest last year that resulted in his previous revocation.[1] Sheriff Robinson told Sgt. Gabbard that he smelled alcohol coming from Defendant's vehicle, and the Sheriff asked Defendant to get out.

Sgt. Gabbard then approached Defendant to conduct field sobriety tests. He testified that he could smell liquor on Defendant. Sgt. Gabbard did not remember whether he asked Defendant about existing medical issues before performing the tests. Sgt. Gabbard also testified that, after Defendant was arrested, a bag containing small vodka bottles (such as might be served on an airplane) was found near the driver's seat of Defendant's car.

Sgt. Gabbard first performed the horizontal gaze nystagmus (HGN) test.[2] The test contains three components (lack of smooth pursuit, maximum deviation, and onset prior to 45 degrees). Sgt. Gabbard explained that, with Defendant, all three HGN components for both of Defendant's eyes indicated intoxication.

---

[1] It was another officer, Clay County Sheriff's Deputy Brandon Edwards, who testified at last year's revocation hearing.

[2] As the Kentucky Court of Appeals has explained:

> "Nystagmus is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotatory. (The Sloane–Dorland Ann. Medical–Legal Dict. (1987) p. 504.) An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN." *People v. Ojeda,* 225 Cal. App. 3d 404, 406, 275 Cal.Rptr. 472, 472-73 (1990).
>
> The horizontal gaze nystagmus (HGN) test is one of the tests law enforcement officers perform either in the field or at the police station when they suspect an individual is under the influence of alcohol or some other drug. The prosecution often introduces the results of the HGN test in DWI prosecutions. This test is based on the theory "that alcohol and drug use increases the frequency and amplitude of HGN and cause it to occur at a smaller angle of deviation from forward." Although alcohol and drug use "may increase the HGN, it can also be produced by other pathological, chemical or natural causes." 3 Barbara E. Bergman and Nancy Hollander, Wharton's Criminal Evidence § 13:49 (15th ed. 2009).

*Leatherman v. Com.*, 357 S.W.3d 518, 527 n.4 (Ky. Ct. App. 2011).

Sgt. Gabbard then administered the walk-and-turn test, using the script he carries on a card in his uniform pocket. Sgt. Gabbard said this test also indicated intoxication because Defendant stepped off the line, used both hands for balance (despite being instructed not to do so), and almost fell.

Third and finally, Sgt. Gabbard conducted the one-legged stand test. He said Defendant failed this test because he used both hands for balance and kept putting his foot down. Sgt. Gabbard concluded Defendant was under the influence, and believed it was alcohol on account of the odor. Sgt. Gabbard arrested Defendant for DUI-first offense because he had watched Defendant driving the car. Sgt. Gabbard explained that he did not notice Defendant swerving or anything like that while driving. Defendant did not resist arrest, but he was "very belligerent with his mouth," cursing the officers and using lots of profanity during the arrest. Deputy Smith drove Defendant to the Clay County Jail. Sgt. Gabbard waited with Defendant's car for the wrecker.

The defense called three witnesses.

A.B. Lawson, Defendant's grandfather, testified that Defendant lives with him. He said he has no alcohol at his house and does not allow it. He testified that, on September 8, Defendant left his house around 1:00 p.m. to check on his mother and go fishing.

Ruth Gibson, the daughter of A.B. Lawson and mother of Defendant, testified that Defendant picked her up around 2:00 p.m. for an appointment after the bank. After going to the bank and running errands, the two of them met a friend named Jason at the "fishing place." Ms. Gibson testified that she did not see Defendant drinking that day or otherwise appearing under the influence. She saw no bottles or cooler at the fishing place. She testified that she had not been drinking.

Their afternoon of fishing was interrupted when two people who lived nearby—a woman named Margaret and a "boy" named Zack—approached them with guns. According to Ms. Gibson, Margaret was screaming and running her mouth. Zack had a pump shotgun, which he fired twice at Ms. Gibson's head. When Defendant came up from the fishing spot, Margaret held a pistol against Defendant's head and accused him of robbing her husband's grave. It was Margaret who called the police while she and Zack held their guns on Defendant and Ms. Gibson. Ms. Gibson said she had known of Margaret all her life, and knew Margaret was a convicted felon. She said Margaret and Zack hid their guns before law enforcement arrived, and that Defendant ran away. Ms. Gibson said she was arrested and charged with public intoxication. Those charges are still pending. Ms. Gibson was released from jail after a few hours, at the same time Defendant was released. She said that at that time Defendant did not smell of alcohol or appear to be under the influence.

Finally, the Defense called Probation Officer Nick Jones. He testified that Defendant contacted him the day of, or the day after, the arrest to report the arrest to the USPO.

**IV.**

The Court first turns to Violation #2, which required the government to prove only that Defendant violated Special Condition #1, that he "must abstain from the use of alcohol." D.E. 466 at 5. Sgt. Gabbard testified in detail about the field sobriety tests he administered, and how all three indicated Defendant was intoxicated. Defendant also smelled of liquor, had bloodshot eyes, and behaved belligerently. Small vodka bottles were found in the car he was driving. His mother admitted there was a period of time after Defendant ran away that she did not know what he was doing. The testimony at the hearing was more than sufficient to establish by a

preponderance of the evidence that Defendant had consumed alcohol as described in Violation #2.

Violation #1, on the other hand, is a matter of state law. The Report charges Defendant with violating Ky. Rev. Stat. Ann. § 189A.010, which sets forth several alternative ways of committing such a violation:

>  (1) A person shall not operate or be in physical control of a motor vehicle anywhere in this state:
>
>   (a) Having an alcohol concentration of 0.08 or more as measured by a scientifically reliable test or tests of a sample of the person's breath or blood taken within two (2) hours of cessation of operation or physical control of a motor vehicle;
>
>   (b) While under the influence of alcohol;
>
>   (c) While under the influence of any other substance or combination of substances which impairs one's driving ability;
>
>   (d) While the presence of a controlled substance listed in subsection (12) of this section is detected in the blood, as measured by a scientifically reliable test, or tests, taken within two (2) hours of cessation of operation or physical control of a motor vehicle;
>
>   (e) While under the combined influence of alcohol and any other substance which impairs one's driving ability; or
>
>   (f) Having an alcohol concentration of 0.02 or more as measured by a scientifically reliable test or tests of a sample of the person's breath or blood taken within two (2) hours of cessation of operation or physical control of a motor vehicle, if the person is under the age of twenty-one (21).

Ky. Rev. Stat. Ann. § 189A.010(1).

At the end of the hearing, it was unclear from the existing record which subsection of Ky. Rev. Stat. Ann. § 189A.010 Defendant was charged with violating. The Report mentioned only § 189A.010. The citation is difficult to read. It appears to say "189A.010(SE)." The state

docket on e-Courts describes the charge as follows: "OPER MV U/INFL ALC/SUBS (189A.010(1E) - 1ST - 189A.010(5A)."

The government argued that subsection (1)(b) applied, and the facts established that Defendant had driven under the influence of alcohol. The defense argued that Defendant was charged under subsection (1)(e). Although the defense agreed with the government that the government need not prove the presence of a substance besides alcohol (to establish a "combination"), the defense argued that there was a lack of proof of impaired driving ability.

Under Kentucky law, the subsections of § 189A.010(1) do not constitute separate crimes. Subsection 189A.010(1) constitutes "one offense"—namely driving under the influence—which can be committed in several alternative ways. *Com. v. Ramsey*, 920 S.W.2d 526, 527 (Ky. 1996) (quoting *Div. of Driver Licensing, Dep't of Vehicle Regulation, Transp. Cabinet v. Bergmann*, 740 S.W.2d 948, 950 (Ky. 1987)). "The elements required for violation of KRS 189A.010 are the operation or physical control of a motor vehicle coupled with one or more levels of impairment as outlined [in the subsections]." *Id*. at 528. The way the different subsections of (1) function is they connect to different penalty divisions in (4) depending on the nature of the driving under the influence. *Id*. at 529. The prohibitions of this remedial statute "are directed toward the condition of the operator. An intoxicated person should not be permitted to operate an automobile anywhere because of the potential dangers of such instrumentalities." *Lynch v. Com.*, 902 S.W.2d 813, 815 (Ky. 1995).

Regardless of the subsection implicated, the first element of any violation of § 189A.010 is that the defendant operated or was in physical control of a motor vehicle. This element is not in dispute, as Sgt. Gabbard's unchallenged testimony was that he saw Defendant driving the car

9

and Sheriff Robinson flagged Defendant down. There is no need to explore the four-factor vehicle-operation test of *Wells v. Com.*, 709 S.W.2d 847, 849 (Ky. Ct. App. 1986).

As noted in regard to Violation #2, the facts establish that Defendant had consumed alcohol. Sgt. Gabbard testified that Defendant smelled of liquor, his eyes were bloodshot, he was belligerent, he failed the field sobriety tests, and vodka bottles were found in his car. Given it is undisputed that Defendant was driving a vehicle prior to his arrest, the evidence preponderates toward finding a violation of subsection (1)(b)—that Defendant operated a motor vehicle while under the influence of alcohol.

Given the parties' agreement that alcohol alone can satisfy the "combined influence of alcohol and any other substance" element of Subsection (1)(e), an additional element comes into play—whether the substance or substances impaired the operator's driving ability. The evidence relevant to this element includes Defendant's observed behavior, including the sobriety tests.

The "primary function" of field sobriety tests is to provide an officer with "reasonable grounds . . . to justify" an arrest and further investigation. *Hayden v. Com.*, 766 S.W.2d 956, 957 (Ky. Ct. App. 1989). Nevertheless, "Evidence of impaired ability" is often presented at trial "through the description of the performance of field sobriety tests which measure psycho-motor functions, hand-eye coordination and reaction time." *Id*. "Being under the influence may or may not have resulted in actual impaired driving on that particular occasion." *Id*. Instead, the statute guards against impaired *ability* to drive as a result of intoxication and requires proof of impaired *driving ability*. *Kidd v. Com.*, 146 S.W.3d 400, 403 (Ky. Ct. App. 2004). In terms of proof, "an officer who has observed a defendant's appearance and behavior is competent to express an opinion as to his degree of intoxication and as to his ability to operate a motor vehicle safely." *Id*. (citing *Hayden*, 766 S.W.2d at 957). As the *Kidd* court explained, "Evidence that a driver's

speech was slurred, that his blood-shot eyes did not react to light, and that he could not perform the simple physical tasks involved in a field sobriety test sufficed to establish that his *ability* to drive was impaired." *Id.* In *Kidd*, there was evidence of marijuana in the defendant's urine. And, although there was no evidence of actual "erratic driving," the results of the field sobriety test sufficed to establish impaired driving ability.

Here, Sgt. Gabbard testified that Defendant failed all three field sobriety tests. Defendant also smelled of alcohol, had bloodshot eyes, and behaved belligerently. Sgt. Gabbard testified that, in his opinion, Defendant was intoxicated. This opinion, based on Sgt. Gabbard's observations, including the sobriety tests, are sufficient to prove by a preponderance of the evidence that Defendant's *ability* to drive was impaired at the time of his arrest, despite the lack of proof of actual erratic driving. Accordingly, under Kentucky case law, all three elements of subsection (1)(e) were established by a preponderance of the evidence.

As previously noted, because § 180A.010(1) describes a single crime, it was not necessary that one subsection be proven to the exclusion of the others. It was enough for the government to establish driving under the influence of alcohol under subsection (1)(b). The defense argued the government had not proven impairment as required by § 180A.010(1)(e). Nevertheless, in the alternative, the Court finds that Defendant's driving ability was also impaired, and he therefore violated subsection (1)(e), as well. Even if Defendant were not guilty of Violation #1, the Court would recommend revocation and the same penalty for Violation #2.

## V.

The Court has evaluated the entire record, including the Report, Addendum, and accompanying documents, the sentencing materials from the underlying Judgment, and materials

11

from the prior revocations. Additionally, the Court has considered all the § 3553 factors imported into the § 3583(e) analysis.

Under § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant pleaded guilty to participating in a conspiracy to manufacture methamphetamine, a Class C felony. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 846. For a Class C felony, the maximum revocation sentence provided under § 3583 is two years of imprisonment. 18 U.S.C. § 3583(e)(3).

The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007). Under § 7B1.1, both violations are Grade C. Given Defendant's criminal history category of I (the category at the time of the conviction) and Grade C violations, Defendant's range, under the Revocation Table of Chapter 7, is three to nine months.

A court may also re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration imposed due to the violation. *See* 18 U.S.C. § 3583(b), (h). The post-revocation cap depends on the "term of supervised release authorized by statute for the offense that resulted in the original term of supervised release." *See* 18 U.S.C. § 3583(h). Given the nature of Defendant's conviction, pursuant to 18 U.S.C. § 841(b)(1)(A), there is no maximum term of supervised release that can be re-imposed.

## VI.

After the Court announced it would recommend finding Defendant guilty of both violations, the parties argued for different penalties. The government recommended an upward

variance—twelve months and a day of incarceration, followed by twelve months of supervised release. The defense requested six months of incarceration, with one year of supervision. Neither side requested new conditions.

The government stressed that the breach of trust was egregious, and it has been difficult to deter Defendant from behavior that puts the public at risk. This is Defendant's third revocation, and the government argued that his previous within-Guidelines penalties had not produced deterrence. The government agreed that Defendant needs treatment (he has a long history of addictions), but his current conditions of release address this need. Defendant also received a downward variance at his original sentence. In Defendant's favor, the government noted that Defendant had no real criminal history prior to this federal case. But this is accounted for in the Guidelines Range. The government suggested that, because twelve months plus one day would make Defendant eligible for good-time credit, this sentence could give him an incentive to learn to comply with rules while in prison.

The defense stressed that Defendant was reacting to a dangerous and stressful situation. He had been held at gunpoint prior to his arrest. Defendant can do well on supervision, the defense argued, and he has returned to his job at the cookie factory which he had prior to the last revocation.

Defendant addressed the Court through a letter that he had written which his attorney read. He continued to maintain his innocence—that he did not drink alcohol. He stressed that he called his probation officer soon after his release from jail, knowing that the officer could have immediately tested him. He asked to be free for the holidays, saying he had not had Thanksgiving with his family since 2013.

## VII.

To determine an appropriate revocation term of imprisonment, the Court has considered all the statutory factors imported into the § 3583(e) analysis, as well as the Guidelines Range of three to nine months. The Court recommends twelve months and one day of imprisonment, followed by a year of supervised release.

The nature and circumstances of Defendant's underlying conviction are serious, of course. *See United States v. Johnson*, 640 F.3d 195, 203 (6th Cir. 2011) (explaining that this sentencing factor focuses upon the original offense rather than the violations of supervised release). He obtained pseudoephedrine so co-conspirators could use it in meth production. And he was addicted to hydrocodone at the time. It appears here that Defendant was self-medicating with alcohol. This continues the pattern that Defendant's drug and alcohol use gets him in trouble with the law.

Defendant's personal history and characteristics are colored by the fact that this is his third revocation, and the fourth time Probation has sought revocation of supervised release. Defendant also had his pre-trial bond revoked for drug use. D.E. 162. Defendant performed well on supervision for a year prior to his first revocation. But, after his second release from federal prison, he immediately got in trouble. Appearing before this Court and having that charge dismissed did not adequately seize his attention. Nor did his revocation last year, which involved public intoxication, scuffling with an officer, and resisting arrest.

Defendant received a lenient sentence in 2014. Although his Guidelines Range was 57-71 months, Defendant was sentenced to 46 months of incarceration. Prior leniency provides a ground for imposing a harsher sentence upon revocation. Application note 4 to U.S.S.G. § 7B1.4 counsels that when there was a downward departure at sentencing, "an upward departure may be

warranted" on revocation. Here, there was a significant downward departure of eleven months. Until now, the Court has not varied upward from the Guidelines. But this prior leniency provides an additional reason for doing so today.

The government is correct that, in light of Defendant's prior pre-trial and post-judgment revocations, his breach of the Court's trust looms large. The Guidelines suggest that the primary wrong in the supervised release context is the violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b). The Court must impose a sentence that is sufficient, but not greater than necessary, to address Defendant's breach of trust and the other statutory goals imported into § 3583(e). After previously having his pretrial bond and post-conviction supervised release revoked (multiple times) for drug use, Defendant again became intoxicated. By driving in this condition, he became a danger to himself and others. The Court acknowledges that he contacted Probation swiftly upon his release. But that was merely what he was required to do anyway. The Court also recognizes that Defendant found himself in a stressful situation. But Officer Gabbard's testimony that, when he encountered Defendant, Defendant had consumed alcohol and then driven a vehicle while impaired, was not contradicted by any proof.

One factor the Court must consider is the need to avoid unwarranted sentencing disparities. This factor is usually addressed by imposing a within-Guidelines sentence. Here, the Court recommends an incarceration sentence of twelve months and a day. This is above the Guidelines Range of three to nine months. When varying from the Range, the Court must provide an adequate explanation and "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Johnson*, 640 F.3d at 205 (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). The Court must state "'the

*specific reason* for the imposition of a sentence different from that described [in the applicable Guidelines or policy statements.]'" *Id.* (quoting 18 U.S.C. § 3553(c)(2)).

The fact that this is Defendant's third revocation provides adequate grounds for varying upward. The Court would make the same recommendation even if Defendant was only found guilty of Violation #2. For the reasons stated above, the recommended penalty is sufficient but not greater than necessary to meet the section 3553(a) factors incorporated into this analysis. *See* 18 U.S.C. § 3583(e). Additional supervision is appropriate here to protect the public and deter future criminal conduct.

## VIII.

Based on the foregoing, the Court **RECOMMENDS:**

(1)  That Defendant be found guilty of both violations.

(2)  Revocation with a term of imprisonment of twelve months and a day, followed by a twelve-month term of supervised release, under the conditions previously imposed.

(3)  Upon Defendant's request, the Court also recommends that Defendant be placed in the closest suitable facility to his home and that he be placed in a low-risk facility.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within **fourteen days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the

District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Judge Van Tatenhove's docket upon submission. If Defendant chooses to waive allocution, he **SHALL** do so on or before the deadline for filing objections.

This the 19th day of October, 2020.

Signed By:
**_Hanly A. Ingram_**
United States Magistrate Judge